STATE OF NORTH CAROLINA v. FRANKLIN LEE McNEIL

No. 437A04

(Filed 19 August 2005)

**Drugs— constructive possession of cocaine—sufficiency of evidence**

There was substantial evidence that defendant constructively possessed cocaine and the trial court correctly denied defendant's motions to dismiss a charge of possession with intent to sell and deliver. A broad range of incriminating circumstances have been considered in concluding that an inference of constructive possession is appropriate where the defendant does not have exclusive possession of the place where the narcotics are found. In this case, an officer responding to a report of drug sales stopped defendant and another man, noted nervousness in the other man and frisked him, defendant fled, the officer pursued defendant into a house where an altercation ensued, defendant repeatedly went "over the top" of a chair with his arm, defendant was subdued, officers found crack behind the chair and a bag of powdered cocaine at the site of the original stop, and defendant admitted that the crack was his but denied the cocaine on the ground belonged to him. The evidence was sufficient to support a finding of actual possession, which may be proven by circumstantial evidence, as well as constructive possession.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 165 N.C. App. 777, 600 S.E.2d 31 (2004), affirming a judgment entered 21 November 2002 by Judge Orlando F. Hudson, Jr. in Superior Court, Durham County, upon a jury verdict finding defendant guilty of possession with intent to sell or deliver cocaine and guilty of habitual felon status. Heard in the Supreme Court 7 February 2005.

*Roy Cooper, Attorney General, by Thomas J. Pitman, Special Deputy Attorney General, for the State.*

*Sofie W. Hosford for defendant-appellant.*

BRADY, Justice.

The sole issue before the Court is whether the State presented sufficient evidence that defendant, Franklin Lee McNeil, possessed 5.5 grams of crack cocaine, such that the trial court properly denied defendant's motions to dismiss the charge of possession with intent to sell or deliver cocaine. We determine that the evidence presented by the State during defendant's trial, considered as a whole and taken in the light most favorable to the State, was sufficient for the trial court to deny defendant's motion to dismiss the charge. Accordingly, we affirm the Court of Appeals.

PROCEDURAL AND FACTUAL BACKGROUND

On 4 March 2002, defendant was indicted by a Durham County Grand Jury for possession with intent to sell and deliver cocaine and having attained habitual felon status. Defendant made two separate pre-trial motions to suppress evidence; one to suppress "tangible evidence," which was made on 11 March 2002, and a separate motion made on 21 November 2002 to suppress defendant's statements to Officer Broadwell. Judge Hudson denied both motions in a written order dated 21 November 2002. Defendant's case was then tried at the 21 November 2002 Criminal Session of Durham County Superior Court before Judge Hudson.

The evidence presented by the State at trial established that on the afternoon of 31 August 2001, Officer J.R. Broadwell of the City of Durham Police Department responded to a complaint that drug sales were occurring on the street in front of 1108 Fargo Street in Durham, North Carolina. As Officer Broadwell turned onto Fargo Street, he saw defendant and a companion standing in front of 1108 Fargo Street. According to Officer Broadwell, upon noticing him turn onto Fargo Street both men "immediately started to try to walk away on Fargo Street toward Umstead." However, Officer Broadwell drove his patrol car farther down the street, exited the vehicle, and then asked the men if he could talk with them. The men stopped, and Officer Broadwell began questioning them by asking them where they lived. Officer Broadwell noted that at first, both men "acted nervous" and "really wouldn't answer the questions. They paused, they looked at

each other and it was almost like they didn't know what to say like they were confused." However, both men eventually indicated that they lived "on Fargo [S]treet."

Officer Broadwell also observed that defendant's companion "was trying to light a cigarette and he was shaking, visibly shaking so bad that he couldn't even hold his cigarette or the lighter near his mouth long enough to light it." At this point, Officer Broadwell began a weapons frisk of defendant's companion. As he did so, Officer Broadwell saw defendant "immediately shove[] his right hand into his right front pocket." Officer Broadwell "advised [defendant] to take his hands out of his pockets," at which time defendant fled the scene. Officer Broadwell pursued defendant, ordering him to stop several times. However, defendant continued to run until he reached a house at 1201 Fargo Street, an address that did not match the address defendant had provided Officer Broadwell in response to the officer's question regarding defendant's home. The door to the house was "just barely cracked open and [defendant] just threw it open and ran into the house."

Officer Broadwell testified that he chased defendant into a room in the "very back of the house," where defendant "went over the top of the chair with his arm at which time [Officer Broadwell] caught up to him" and attempted to place defendant in custody. Defendant "threw" Officer Broadwell off of him and began to run back through the house. Officer Broadwell "got back up off the floor, grabbed [defendant] and [they] wrestled and fought through several rooms of the house" until they reached the kitchen area, where Officer Broadwell was able to handcuff defendant and place him in custody.

Other officers arrived on the scene and Officer Broadwell "immediately went back to the back room and looked behind the chair" and retrieved twenty-two rocks of crack cocaine, individually wrapped in corners of plastic bags. Once this evidence was collected, Officer Broadwell escorted defendant to his patrol car, which he had left in the area where he originally started chasing defendant. While there, Officer Broadwell found "three more smaller bags with a powdered substance in them laying on the ground." Officer Broadwell picked the bags up and said, "[O]h, look what we have here," to which defendant responded that the crack found in the house was his, but the three bags found on the ground were not.

At the close of the State's evidence, defendant moved to dismiss the charges, which the trial court denied. Defendant then testified

that he and his companion had been on Fargo Street to cut two lawns. According to defendant, when Officer Broadwell approached them, they were taking a break after completing half of the second lawn. Defendant further testified that he ran from Officer Broadwell because he was not sure if his wife had "taken a warrant out" on him as a result of a domestic dispute. Lastly, defendant denied ever having made any statements to Officer Broadwell after being hand-cuffed. Defendant specifically testified that after Officer Broadwell had led defendant to the car and searched defendant, he put defendant in the car and then entered the vehicle as well. According to defendant, when Officer Broadwell entered the car "he had a bag of something in his hand. And he said oh, this is yours too and I said no. And he said oh, okay, these are not yours but the other is yours." Defendant testified that he simply did not respond to Officer Broadwell's last statement.

At the close of all evidence, defendant renewed his motion to dismiss the charges against him; however, the trial court denied the motion and a Durham County jury found defendant guilty of possession with intent to sell or deliver cocaine and having attained habitual felon status. Judge Hudson then sentenced defendant in the presumptive range to a minimum term of 133 months imprisonment to a maximum term of 169 months.

Defendant gave notice of appeal, and on 17 August 2004, the Court of Appeals found no error in defendant's trial, Judge Elmore dissenting. 165 N.C. App. at 785, 600 S.E.2d at 37. In his dissent, Judge Elmore concluded that there was insufficient evidence that defendant possessed the cocaine because defendant did not have exclusive possession of the house at 1201 Fargo Street and "[w]hile there was some evidence of other incriminating circumstances, that evidence was not substantial." *Id.* at 789, 600 S.E.2d at 39. Defendant entered notice of appeal based on Judge Elmore's dissent, and this Court heard oral arguments from both parties on 7 February 2005.

ANALYSIS

In addressing defendant's appeal from his conviction for possession with intent to sell or distribute cocaine, we note that "[w]hen a defendant moves to dismiss a charge against him on the ground of insufficiency of the evidence, the trial court must determine 'whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense.' " *State v. Garcia*, 358 N.C. 382, 412, 597 S.E.2d 724, 746 (2004) (quot-

ing *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996)), *cert. denied*, —— U.S.——, 161 L. Ed. 2d 122 (2005); *see also State v. Morgan*, 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004); *State v. Butler*, 356 N.C. 141, 145, 567 S.E.2d 137, 139 (2002).

" 'Substantial evidence' is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion." *Garcia*, 358 N.C. at 412, 597 S.E.2d at 746 (citations omitted); *see also State v. Williams*, 355 N.C. 501, 578-79, 565 S.E.2d 609, 654 (2002) (quoting *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995)), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003), *quoted in State v. Armstrong*, 345 N.C. 161, 164-65, 478 S.E.2d 194, 196 (1996). Moreover,

[a] "substantial evidence" inquiry examines the sufficiency of the evidence presented but not its weight. The reviewing court considers all evidence in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence. Evidentiary "[c]ontradictions and discrepancies are for the jury to resolve and do not warrant dismissal."

*Garcia*, 358 N.C. at 412-13, 597 S.E.2d at 746 (citations omitted) (quoting *State v. Gibson*, 342 N.C. 142, 150, 463 S.E.2d 193, 199 (1995)) (alteration in original). Additionally, " '[i]f there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.' " *Butler*, 356 N.C. at 145, 567 S.E.2d at 140 (alteration in original) (quoting *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988)).

In the instant case, in order to establish that defendant possessed crack cocaine with intent to sell or deliver, the State was required to prove that (1) defendant possessed the crack cocaine and that (2) defendant intended to sell or deliver the narcotics to others. N.C.G.S. § 90-95(a)(1) (2003); *State v. Thorpe*, 326 N.C. 451, 454, 390 S.E.2d 311, 313 (1990). On appeal, defendant asserts that the State failed to prove that defendant constructively possessed the crack cocaine found by Officer Broadwell, as defendant "had neither a proprietary interest in the house at 1201 Fargo Street nor exclusive control of the area where the drugs were found." We conclude, however, that ample evidence was presented to establish that defendant constructively possessed the cocaine in question. Our decision is

based upon the historical evolution of the concept of criminal possession, beginning with Prohibition, as well as more recent precedent from this Court.

The prohibition era began with the ratification of the Eighteenth Amendment to the United States Constitution in 1919 and resulted in increased use of the constructive possession doctrine in criminal cases. The Eighteenth Amendment specifically prohibited the "manufacture, sale, or transportation of intoxicating liquors" within the country, as well as the importation or exportation of such liquors, beginning one year after ratification passage of the amendment. Shortly after the Eighteenth Amendment was ratified, the National Prohibition Act was passed to further regulate intoxicating liquors, to "prohibit intoxicating beverages, and to regulate the manufacture, production, use, and sale of high-proof spirits for other than beverage purposes, and to insure an ample supply of alcohol and promote its use in scientific research and in the development of fuel, dye, and other lawful industries." National Prohibition Act, ch. 85, 41 Stat. 305, 305 (1919) (repealed 1933); *Dillon v. Gloss*, 256 U.S. 368, 376-77, 65 L. Ed. 994, 997 (1921) (finding that ratification of the Eighteenth Amendment occurred on 16 January 1919; thus, the amendment and the National Prohibition Act were effective on 16 January 1920); *see also* William J. McFadden, *The Law of Prohibition: Volstead Act Annotated* 3 (1925).

Four years later our General Assembly enacted legislation, commonly referred to as the Turlington Act, to harmonize North Carolina law with the new federal Act. Act of Mar. 1, 1923, ch. 1, 1923 N.C. Sess. Laws 55 (an act to make the state law conform to the national law in relation to intoxicating liquors). This new statute made it a crime to "manufacture, sell, barter, transport, import, export, deliver, furnish, purchase, or possess any intoxicating liquor except as authorized" by the Act itself. Ch. 1, sec. 2, 1923 N.C. Sess. Laws at 55. Interestingly, under the Turlington Act, possession for "personal consumption" of an intoxicating liquor within "one's private dwelling" was not criminalized. Ch. 1, sec. 10, 1923 N.C. Sess. Laws at 58. Otherwise, mere possession of an intoxicating liquor was illegal and served as prima facie evidence of a violation of the Act. *Id.*; *see also State v. Norris*, 206 N.C. 191, 173 S.E. 14 (1934) (discussing prohibition under North Carolina law); Daniel Jay Whitener, *Prohibition in North Carolina, 1715-1945* 182-83 (1945).

Thus, in *State v. Meyers*, this Court was faced with the issue of what constituted "possession" under the Turlington Act. 190 N.C. 239,

STATE v. McNEIL

[359 N.C. 800 (2005)]

242-43, 129 S.E. 600, 601 (1925). In *Meyers*, defendant's property was searched three times for contraband liquor. *Id.* at 240, 129 S.E.2d at 600. The first search found nothing. *Id.* The second time law enforcement authorities searched the defendant's property, although no liquor was found, an impression "like that of a jug" was found on the ground fifteen "steps" behind defendant's barn. *Id.* During the third search, "the defendant was present and [law enforcement authorities] found no evidence of liquor in his dwelling or outbuildings, but did find a track leading from the barn . . . to his hog lot in a mulberry orchard down beside the public road in the corner of his field." *Id.* The officers ultimately followed this track to "a three-gallon jug" containing about two gallons of whiskey. *Id.* "The ditch and the jug were about 150 yards from defendant's dwelling on the lands that he had rented . . . ." *Id.*

The defendant was indicted and ultimately convicted for possession of liquor and unlawful transportation of intoxicating liquors. *Id.* at 240, 242, 129 S.E. at 600, 601. The defendant appealed, and this Court found that the defendant's motion to dismiss was properly denied because possession of contraband can be either actual or constructive; thus, "[i]f the liquor was within the power of the defendant, in such a sense that he could and did command its use, the possession was as complete within the meaning of the statute as if his possession had been actual." *Id.* at 242-43, 129 S.E. at 601-02.

A few years later, this Court applied *Meyers* to affirm a defendant's 1932 conviction for unlawfully purchasing, possessing, selling, and transporting intoxicating liquors or possessing equipment or ingredients for manufacture thereof, based on the conclusion that the defendant constructively possessed the alcohol. *Norris*, 206 N.C. at 192-93, 196-97, 173 S.E. at 14-15, 17. In *Norris*, when authorities appeared to search the defendant's property pursuant to a warrant, the defendant "immediately went to feed some hogs" while the defendant's "wife ran out of the house with three pints of liquor in her lap and some in a fruit jar and hid it near the house under some pea vines." *Id.* at 196, 173 S.E. at 17. Shortly thereafter, the defendant's son "ran across the branch, pouring out the liquor which he had in half-gallon jars, as he ran" and the defendant's "daughter took some sacks and threw them over a 30-gallon drum." *Id.* Additionally, "[t]wo cases of home brew were found in the chicken coop, 3 dozen bottles in the case," and the authorities located "two 50-gallon barrels containing 'mash.' " *Id.* at 196-97, 173 S.E. at 17. Thus, relying on *Meyers*, this Court found that although the defendant's family was seen dis-

posing of the liquor, the defendant was properly convicted of unlawfully possessing the liquor based on an inference of constructive possession. *Id.* at 197, 173 S.E. at 17.

In 1933, prohibition drew to an abrupt halt with the ratification of the Twenty-first Amendment, which repealed the Eighteenth Amendment. *See United States v. Chambers*, 291 U.S. 217, 222-23, 78 L. Ed. 763, 765 (1934) (taking "judicial notice of the fact that the ratification of the Twenty-first Amendment of the Constitution of the United States . . . was consummated on December 5, 1933"; thus, prosecutions under the National Prohibition Act, including proceedings on appeal, pending on or begun after the date of repeal had to be dismissed for lack of jurisdiction) (footnote omitted).

However, the inference of constructive possession continued to play an integral part in the prosecution of possessory crimes, particularly with respect to the "War on Drugs." This struggle, which continues today, began in earnest with the enactment of the federal Comprehensive Drug Abuse Prevention and Control Act of 1970, which criminalized the possession of controlled substances. Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (1970) (amending the Public Health Service Act and other laws to provide increased research into, and prevention of, drug abuse and drug dependence; to provide for treatment and rehabilitation of drug abusers and drug dependent persons; and to strengthen existing law enforcement authority in the field of drug abuse) (codified as amended at 21 U.S.C. §§ 801-971 (2000 & Supp. II 2002)). A year later the General Assembly enacted the North Carolina Controlled Substances Act "to revise the laws concerning drugs, the various illegal and dangerous drugs and drug substances, and to provide law enforcement authorities with additional powers of detection of drug traffic." Act of July 19, 1971, ch. 919, 1971 N.C. Sess. Laws 1477 (codified as amended at N.C.G.S. §§ 90-86 to -113.8 (2003)); *see also State v. Jones*, 358 N.C. 473, 479-80, 598 S.E.2d 125, 129-30 (2004) (discussing the legislative history of the Controlled Substances Act and subsequent amendments to the Act). Today the Controlled Substances Act makes it unlawful to possess a controlled substance or to "manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance," including cocaine, a Schedule II controlled substance. N.C.G.S. §§ 90-95(a)(1), (3), -90(1)d.

"[I]n common speech and in legal terminology, there is no word more ambiguous in its meaning than [p]ossession. It is interchange-

ably used to describe actual possession and constructive possession which often so shade into one another that it is difficult to say where one ends and the other begins." *Nat'l Safe Deposit Co. v. Stead,* 232 U.S. 58, 67, 58 L. Ed. 504, 509-10 (1914); *see also* 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.1(e), at 432 (2d ed. 2003) (Possession is a nebulous term, "often used in the criminal law without definition," largely because "it is a 'common term used in everyday conversation.' ") (footnote and citation omitted). However, the increase of possessory crimes has led to a broad application of the term "possession" to situations in which actual physical control could not be directly proved.

In fact, this Court extended the application of constructive possession to a case involving prosecution for possession with intent to distribute marijuana in *State v. Baxter,* 285 N.C. 735, 736-37, 208 S.E.2d 696, 697 (1974). In *Baxter,* pursuant to a valid search warrant, police officers searched an apartment the defendant shared with his wife. *Id.* at 736, 208 S.E.2d at 697. The search resulted in the seizure of approximately 219 grams of marijuana divided into 16 small envelopes, and the defendant and his wife were ultimately indicted for possession with intent to distribute the marijuana. *Id.* This Court noted that the uncontroverted evidence at trial established that the defendant and his wife were the only occupants of the apartment, that the marijuana in question had been found under male and female undergarments in a dresser, and "that a man's coat with an envelope containing marijuana in its pocket was found in the closet of the bedroom and that no one other than the defendant's wife was in the apartment at the time of the search." *Id.* at 736-37, 208 S.E.2d at 697.

This Court held that, just as the inference of constructive possession was appropriate during the prohibition era, so too was such an inference appropriate in a prosecution under the Controlled Substances Act. *Id.* at 737-38, 208 S.E.2d at 698. In so holding, the Court reasoned that:

> As is true with reference to the possession of intoxicating liquor, an accused has possession of marijuana within the meaning of the Controlled Substances Act, G.S. Chapter 90, Art. V, when he has both the power and the intent to control its disposition or use, which power may be in him alone or in combination with another. Constructive possession is sufficient. Nothing else appearing, a man residing with his wife in an apartment, no one else residing or being present therein, may be deemed in con-

structive possession of marijuana located therein, notwithstanding the fact that he is temporarily absent from the apartment and his wife is present therein.

*Id.* (citations omitted).

With the increase in drug-related crime, this Court has repeatedly been faced with whether constructive possession has been established in prosecutions for possession of controlled substances and has consistently stated:

> "[I]n a prosecution for possession of contraband materials, the prosecution is not required to prove actual physical possession of the materials." *State v. Perry*, 316 N.C. 87, 96, 340 S.E.2d 450, 456 (1986). Proof of *nonexclusive*, constructive possession is sufficient. *Id.* Constructive possession exists when the defendant, "while not having actual possession, . . . has the intent and capability to maintain control and dominion over" the narcotics. *State v. Beaver*, 317 N.C. 643, 648, 346 S.E.2d 476, 480 (1986).

*State v. Matias*, 354 N.C. 549, 552, 556 S.E.2d 269, 270-71 (2001), *quoted in Butler*, 356 N.C. at 145-46, 567 S.E.2d at 140 (emphasis added); *see also State v. Spencer*, 281 N.C. 121, 129-30, 187 S.E.2d 779, 784 (1972) (affirming defendant's conviction for possession of marijuana because the evidence, that the defendant had been seen several times in and around a pig shed where marijuana was found approximately twenty yards from his residence, and that marijuana seeds were found in the defendant's bedroom, was sufficient for the jury to consider the charge based on constructive possession); *State v. Allen*, 279 N.C. 406, 412, 183 S.E.2d 680, 684-85 (1971) (holding that evidence that the utilities at a residence where heroin was sold were listed in defendant's name, that an army identification card bearing the defendant's name and other papers belonging to the defendant were located in the same bedroom where heroin was found, and that a sixteen-year old obtained heroin from the house and sold it at defendant's direction was sufficient to have the jury consider whether the defendant possessed the heroin under a theory of constructive possession).

" 'Where [contraband is] found on the premises under the control of an accused, this fact, in and of itself, gives rise to an inference of knowledge and possession which may be sufficient to carry the case to the jury on a charge of unlawful possession.' " *Butler*, 356 N.C. at 146, 567 S.E.2d at 140 (quoting *State v. Harvey*, 281 N.C. 1, 12, 187

S.E.2d 706, 714 (1972)). "However, unless the person has exclusive possession of the place where the narcotics are found, the State must show *other incriminating circumstances* before constructive possession may be inferred." *State v. Davis*, 325 N.C. 693, 697, 386 S.E.2d 187, 190 (1989) (emphasis added).

In *Davis*, this Court specifically addressed the existence of other incriminating circumstances in the context of the defendant's non-exclusive possession of a mobile home. *Id.* at 697-99, 386 S.E.2d at 190-91. During the defendant's trial for trafficking in controlled substances and possession of a controlled substance, the State presented evidence that, upon entering a mobile home to execute a valid search warrant, law enforcement authorities found the mobile home occupied by seven adults, including the defendant. *Id.* at 693-95, 386 S.E.2d at 188. As the authorities entered the mobile home, one of the adults ran down the hall into a bathroom and flushed the toilet; however, a pursuing officer reached into the flushing toilet and retrieved several plastic bags, containing what was later determined to be cocaine. *Id.* at 695, 386 S.E.2d at 188. Various other controlled substances were found throughout the mobile home, as well as a "sales contract" indicating that the defendant had purchased the mobile home. *Id.* at 695, 386 S.E.2d at 188-89. The defendant was then searched resulting in the seizure of several "white tablets" found in the defendant's "pants pockets and between his legs in the seat of [his] chair." *Id.* at 695, 386 S.E.2d at 189.

After being convicted of both possession of controlled substances and trafficking in a controlled substance, the defendant appealed, claiming insufficient evidence was presented at trial. *Id.* at 694, 696, 386 S.E.2d at 188-89. This Court, however, affirmed his convictions after finding that "the evidence was sufficient to go to the jury on the issue of defendant's constructive possession of the narcotics found in the mobile home." *Id.* at 697, 386 S.E.2d at 190.

Similarly, in *State v. Matias*, this Court determined that the State provided sufficient evidence to establish that defendant constructively possessed cocaine found in a vehicle occupied by defendant and three other individuals. 354 N.C. at 551-53, 556 S.E.2d at 270-71. In that case, defendant was a passenger in a vehicle stopped by law enforcement authorities after they detected the odor of marijuana. *Id.* at 550-51, 556 S.E.2d at 270. After ordering the occupants of the vehicle to leave the car, the officers searched it and found a plastic bag containing marijuana and a small " 'balled up' " piece of tin foil that was later determined to contain cocaine "located between the

seat pad and back pad in the back right seat where defendant had been sitting." *Id.* at 551, 556 S.E.2d at 270. The officers also located marijuana seeds, rolling papers, an unopened beer can, and a cigar inside the vehicle. *Id.* On appeal, this Court held that there was sufficient evidence of "other incriminating circumstances" to support the charge of possession and affirmed the defendant's conviction. *Id.* at 552-53, 556 S.E.2d at 271.

More recently in *State v. Butler*, this Court broadened the scope of constructive possession to affirm the defendant's convictions for two counts of trafficking in cocaine. 356 N.C. at 142, 148, 567 S.E.2d at 138, 141. At the defendant's trial, the State presented evidence that officers assigned to the Interdiction Unit of the Drug Task Force of the Raleigh Police Department were observing a Greyhound Bus terminal when the defendant left a bus bound from New York City to Miami Beach, Florida, both of which are considered "source" cities for illegal drugs. *Id.* at 143, 567 S.E.2d at 138. The officers observed the defendant leave the bus carrying only a small duffel bag and proceed to the terminal entrance. *Id.* Once there the defendant stopped, turned around, looked at the officers, paused, and then quickly walked through the terminal. *Id.* The officers followed the defendant, noting that he looked back several times before "hopp[ing]" into a cab, seating himself directly behind the driver, slamming the door, and yelling " 'let's go, let's go, let's go.' " *Id.*

However, before the cab driver began driving, the officers emerged from the terminal and signaled him not to leave. *Id.* The officers approached the vehicle and instructed the defendant to get out of the vehicle with his bag, noting that he was " 'very nervous' " and " 'fidgety.' " *Id.* As the defendant left the vehicle, he "bent down and reached toward the driver's seat prior to opening the door" such that the officers were able to " 'see just barely the top of his head and part of his shoulder"; however, they could not see his hands. *Id.* at 143, 567 S.E.2d at 139. According to the cab driver, "he felt [the] defendant 'struggling' behind him and 'pushing the back of the front seat' before opening the door." *Id.* at 143-44, 567 S.E.2d at 139. The officers also noted that the defendant then walked toward the front doors of the terminal without being instructed to do so, thus leading them away from the vehicle. *Id.* at 144, 567 S.E.2d at 139. They then briefly questioned the defendant and asked him to accompany them to a private room inside the terminal where, with the defendant's permission, they conducted a pat down search of the defendant and searched his duffel bag. *Id.* The officers found no contraband and

told the defendant he was free to go, which he did, leaving the terminal by foot in spite of his previous urgency to depart by cab. *Id.*

According to the cab driver, after defendant departed his vehicle, he drove another fare. *Id.* The passenger entered the cab through the rear door and sat in the rear passenger seat throughout the six to seven block trip. *Id.* Then the cab driver returned directly to the bus station. *Id.* The cab driver testified that "at no time during the ride did he observe or otherwise detect the man make any movements toward the driver's side of the cab." *Id.* Upon the cab's return to the bus terminal, the police officers asked to search the vehicle. *Id.* The cab driver consented, and the officers found "a package under the driver's seat, wrapped in a white napkin and secured with Scotch tape" containing a white powdery substance later determined to be cocaine. *Id.* The cab driver was questioned and indicated that he had last cleaned the vehicle before beginning his shift. *Id.* The defendant was the driver's first fare, and according to the driver, the cocaine had not been under the driver's seat when the defendant entered the vehicle. *Id.* Shortly thereafter, the defendant was located ten to twelve blocks from the bus terminal, where he was placed under arrest and searched, resulting in the discovery of "a small sum of money, a pager, and a cell phone." *Id.* at 145, 567 S.E.2d at 139.

The defendant was tried and convicted of two counts of trafficking in cocaine. He appealed to this Court, claiming the Court of Appeals erred in affirming the trial court's denial of his motion to dismiss the charges due to insufficient evidence of possession, constructive or actual, of the cocaine. *Id.* In affirming the defendant's convictions, this Court considered all of the above facts to be "additional incriminating circumstances" indicating the appropriateness of the inferring constructive possession. *Id.* at 147-48, 567 S.E.2d at 141.

Thus, in *Davis, Matias,* and *Butler,* this Court considered a broad range of other incriminating circumstances, concluding in each instance that an inference of constructive possession was appropriate although the defendant did not have exclusive possession of the respective mobile home, car, or taxi he was occupying at or near the time the contraband was seized by law enforcement authorities. We find this trio of cases instructive, and, as in these cases, we affirm defendant's convictions.

In the case *sub judice,* additional incriminating circumstances tending to establish defendant's constructive possession of the cocaine abound. Taken in the light most favorable to the State,

and drawing all reasonable inferences in favor of the State, the evidence showed that Officer Broadwell responded to a report of drug sales at 1108 Fargo Street. Officer Broadwell stopped defendant and another man to question them about drug sales in the area, noting that the other man was visibly nervous and was physically unable to light his cigarette.

As Officer Broadwell performed a weapons frisk of this individual, defendant fled the scene. Officer Broadwell pursued defendant into a residence, where defendant physically resisted arrest. As Officer Broadwell attempted to restrain defendant, Officer Broadwell observed defendant repeatedly go "over the top of [a] chair with his arm" in the room. Defendant continued to resist Officer Broadwell's attempt to arrest him, ultimately continuing the fight into another room. After struggling with defendant for several minutes, Officer Broadwell was eventually able to subdue him. Shortly after handcuffing defendant, Officer Broadwell returned to the room in which he observed defendant's arm "go" over the armchair, where he found twenty-two individually wrapped rocks of crack cocaine. Later, as Officer Broadwell returned with defendant to his patrol car, he noted a bag lying on the ground in the area where he had initially stopped defendant. Believing the bag to contain powder cocaine, Officer Broadwell picked it up, saying "[L]ook at what we have here," to which defendant responded that "the crack was his but the bags on the ground were not." We find that, considering the evidence in the light most favorable to the State, these other circumstances clearly incriminate defendant and that an inference of constructive possession was appropriate in this case; however, we note that the evidence is also sufficient to support a jury finding of actual possession.

As stated above, actual and constructive possession "often so shade into one another that it is difficult to say where one ends and the other begins." *Nat'l Safe Deposit Co. v. Stead*, 232 U.S. 58, 67, 58 L. Ed. 504, 509-10 (1914) (citing *Union Trust Co. v. Wilson*, 198 U.S. 530, 537, 49 L. Ed. 1154, 1156 (1905)). This ambiguity is likely attributable to the fact that both actual and constructive possession will support a finding of "possession" within the meaning of our statutes, making it unnecessary to distinguish between the two in many instances. Nonetheless, it is important analytically to appreciate that actual possession may be proven by circumstantial evidence and that, given the abundant circumstantial evidence presented at defendant's trial, reasonable jurors could have found as a fact that defendant had actually possessed the cocaine found behind the chair. Although the

Court of Appeals affirmed defendant's conviction based upon a finding of constructive possession and thus, the differentiation is not critical to the case before us today, it could be important in future cases and we leave further discussion of this distinction for another day.

## CONCLUSION

For the reasons stated above, we determine that the State presented substantial evidence that defendant constructively possessed the cocaine in question. Accordingly, the trial court properly denied defendant's motions to dismiss the charge of possession with intent to sell and deliver cocaine. Thus, we affirm the majority decision of the Court of Appeals.

AFFIRMED.